UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DARIANA D. ELLIS | * | CIVIL ACTION NO. 20-1274 |
| | * | |
| VERSUS | * | SECTION: "B"(1) |
| | * | |
| ANDREW SAUL, COMMISSIONER OF | * | JUDGE IVAN L. R. LEMELLE |
| THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *********************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Dariana D. Ellis, seeks judicial review, pursuant to Section 405(g) of the

Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security

Administration (the "Commissioner") finding that the plaintiff's disability has ended under Section

223(f) of the Act.  The matter has been fully briefed on cross-motions for summary judgment. For

the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by

the plaintiff (Rec. Doc. 18) be DENIED; and the Motion for Summary Judgment filed by the

Commissioner (Rec. Doc. 25) be GRANTED.

**Procedural Background**

Ellis was found disabled under the Act as of April 25, 2011.[1] R. at 110. In issuing the

favorable decision on June 26, 2012, the Administrative Law Judge ("ALJ") determined she had

the following medically determinable impairments: costochondritis; status post splenic infarct;

major depressive disorder; and anxiety/PTSD. R. at 105. The ALJ found that Ellis had the residual

functional capacity:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except
> that she would be able to lift 10 pounds occasionally and no weight frequently; she

---

[1] Although the state agency determined she was not disabled, upon review, the Administrative Law Judge determined that Ellis had been under a disability as defined by the Act since her alleged disability onset date of April 25, 2011. R. at 110.

1

> would be unable to sit for more than four hours, walk for one hour, or stand for three hours daily; due to pain she would require an unreasonable number of unscheduled rest breaks; she would be limited to only simple, stress free work; and she would be unable to complete a normal workday without interference from psychological symptoms, pain, or medication side effects. The claimant's residual functional capacity is thus less than sedentary, but due to symptoms and treatment she would be unable to sustain a work effort on a regular and continuing basis.

R. at 106 (citations omitted). The ALJ commented that "[m]edical improvement is expected with appropriate treatment. Consequently, a continuing disability review is recommended in 18 months." R. at 110. That continuing disability review was conducted and on March 21, 2016, the State Agency determined that Ellis was no longer disabled as of March 22, 2016. R. at 126. This determination was upheld upon reconsideration after a disability hearing by a State Agency Disability Hearing Officer in a decision issued February 21, 2018. R. at 204-12.

Ellis obtained counsel and requested a hearing before an ALJ, which was held on March 19, 2019. R. at 31. On June 12, 2019, the ALJ issued an adverse decision. R. at 7. The Appeals Council denied review on March 19, 2020. R. at 1.

On April 23, 2020, Ellis filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 11, 14). The parties filed cross-motions for summary judgment. (Rec. Docs. 18, 25). Ellis is represented by counsel.

**Evidence in the Record**

*Medical Records*

On April 19, 2011, Ellis presented at the Southern Maine Medical Center with left upper quadrant pain that was intermittently severe and with nausea and vomiting. R. at 475. She was discharged but returned to the emergency room with ongoing pain. Id. The CT scan showed a large wedge-shaped defect in the spleen consistent with infarcts and abnormality of the left

ventricle. Id. An echocardiogram was performed and showed left ventricular pseudoaneurysm versus left ventricular diverticulum. Id. A history of right upper chest and shoulder pain was noted. Id. It was noted that an exercise echocardiogram the previous fall was normal. Id. A left heart catheterization, coronary arteriography, resection of LV diverticulum, and closure of PFO were performed on April 25 and April 27, 2011. Id. Postoperative chest x-rays on April 28, 2011, revealed right internal jugular central catheter tip appearing to enter the azygous vein with deformity of the tip. R. at 489. Mild retrocardiac consolidation likely atelectasis and possible small left pleural effusion were also noted. Id.

Ellis presented to cardiology on May 24, 2011, to establish care post surgery. R. at 583. She was seen by Dr. Melkon Hacobian. Id. She denied substernal chest pain and chest pressure. R. at 584. A Holter monitor to assess for any arrhythmias and a baseline post-operative echocardiogram were ordered. R. at 585.

Ellis followed up with Dr. Hacobian on June 15, 2011. R. at 573. The transthoracic echocardiogram ordered May 24, 2011, showed normal left ventricle size, normal wall thickness, septal wall motion consistent with post-operative state, ejection fraction greater than 55%, and normal diastolic function. Id. The Holter monitor showed some ventricular ectopics and episodes of sinus tachycardia, with no prolonged pauses or episodes of sustained tachyarrhythmias. Id. She reported she had started exercising, walking almost two miles daily at a slow pace. Id. She reported some feeling of heart racing at the end that resolves with rest. Id. She denied substernal chest pain or chest pressure. R. at 574. Dr. Hacobian noted she was doing fine from a cardiovascular standpoint. R. at 575. She was encouraged to increase her exercise level gradually. Id.

Ellis presented to Cardiology on September 6, 2011, to follow up for her left ventricle apical diverticulum with Dr. Trzaska. R. at 569. She complained of mild chest wall discomfort

with palpitation and occasional palpitations. Id.  She denied constrictive pericarditis, shortness of breath, orthopnea, or lightheadedness. Id.  She reported walking two miles daily without symptoms. Id.  She was not experiencing side effects from her medication. Id.  It was noted that she was "overall doing well." R. at 570. Supervising physician Dr. Joseph Wight added that he was not worried about palpitations as this might be anxiety. Id.  at 571. He noted the echocardiogram was normal and the Holter monitor showed sinus tachycardia. Id.

Ellis presented for a consultative psychological assessment with Roger Ginn, Ph.D., on October 5, 2011. R. at 558. She reported that she had always been in good health until her open heart surgery in April 2011. Id. She reported that she was still in a lot of pain and that she could not sleep well or do many of the things she used to be able to do. R. at 558-59. She reported worrying about dying because there is a history of heart problems in her family. R. at 559. She had never had any mental health treatment or had issues with anxiety or depression before. Id. She reported spending most of her time at home, that she had a few friends, but that she does not like to deal with people. Id.

Dr. Ginn found that Ellis had a lot of problems focusing on short-term memory tasks. Id. He noted that one of the main barriers to her working was her physical health. Id. Citing her previous work experience, he believed that if her prognosis from her last surgery is for gradual improvement then she would be able to get back into the world of work and function appropriately. Id. He diagnosed Ellis with adjustment disorder with depressed mood. Id.  He assigned a Global Assessment of Functioning ("GAF") score of 40. Id.

Ellis presented at the Portland Community Health Center ("PCHC") on Oct. 11, 2011, complaining of chest pain. R. at 629. On October 25, 2011, she presented for pap, flu, and

depression. R. at 628. On Nov. 15, 2011 she followed up for labs. R. at 627. She complained of obesity and depression, and it was noted she was on Prozac. Id.

Meanwhile, Ellis began physical therapy on October 20, 2011. She reported increased pain with reaching outward or overhead. R. at 598. She reported taking Tylenol for chest pain and occasionally Percocet. R. at 599. She reported sleep disturbance and memory difficulties since her surgery. R. at 600. Range of motion in the upper extremities was within normal limits. Id. She was hesitant and most resistant with overhead motion. Id. The next week she reported increased soreness following her first appointment. R. at 596. She exhibited guarded posture on the right upper extremities due to pain. Id. She again reported increased soreness related to the exercises on November 3, 2011. R. at 594. On November 17, 2011, she reported that therapy had helped her pain and helped her use her left arm with less caution. R. at 592. The physical therapist noted pain with resistance exercises on right, but fair tolerance to isometrics. Id.

Ellis followed up with Dr. Trzaska in Cardiology on November 29, 2011, complaining of chest wall pain. R. at 561. She appeared ill. R. at 562. There was chest wall tenderness without evidence of clicking. Id. The surgical wound was well healed without erythema or swelling. Id. Depressed mood was noted. Id. No evidence for structural wound problem or decompensated congestive heart failure was noted. Id. Normal left ventricular ejection fraction per echocardiogram 6 months earlier was noted. Id. Dr. Trzaska noted that Ellis would be evaluated for structural heart abnormalities and chronic pulmonary embolism and that if that was negative, the pain was likely related to sternal wound healing and altered respiratory mechanics. Id.

She returned to the PCHC on December 9, 2011, and reported her depression and pain were worse. R. at 623. She followed up on January 1, 2012, complaining of chest pain on the right side that was strong. R. at 622. It was noted that her depression and PTSD had improved. Id.

Complicated grief regarding her mother's death was also noted. Id. She was assessed with post-operative chest pain, costochondritis, and muscle spasms. Id.

On February 1, 2012, she reported chest pain ranging from 2/10 to 6/10. R. at 620. She was assessed with costochondritis, thoracic kyphosis, PTSD/depression. R. at 619. She reported that her feet swell from standing or sitting for a long period of time. R. at 620. On February 6, 2012, she reported her pain was the same. R. at 617. She reported a recent breakup with her partner and that her sleep had been interrupted since then, but not due to pain. Id. She was assessed with costochondritis status post cardiothoracic surgery. Id. She reported ankle swelling after standing or sitting for a period of time. R. at 618. She reported pain ranging from 4/10 to 10/10 since her last visit. Id.

On February 15, 2012, Ellis reported an increase of pain after treatment and increased back soreness. R. at 614. She was assessed with costochondritis. Id. She reported a pain scale ranging from 4/10 to 10/10 since her last visit. R. at 616. She reported ankle and foot swelling. Id. On February 21, 2012, Ellis followed up at PCHC for depression and PTSD. R. at 612. On February 22, 2012 she complained of costochondritis and IVP. R. at 610. It was noted that she had stopped Prozac. Id. Costochondritis had improved. Id. She reported pain ranging from 6/10 to 10/10 since her last visit. R. at. 611. She reported her feet swell after sitting or standing too long. Id. On February 27, 2012, she presented at PCHC complaining of costochondritis, headache, and insomnia. R. at 608. She reported she had been off of her psychiatric medications for two weeks and that the first week was okay but the second week was not so good. Id. Risks of SSRI use in pregnancy were discussed. Id. She reported swelling in the feet and ankles. R. at 609. She reported pain ranging from 4/10 to 10/10 since her last visit. Id. On March 5, 2012 Ellis followed up for costochondritis, IVP, and depression. R. at 602.   The records note that they contacted her

obstetrician to alert them that Ellis's depression was worsening without medication. Id. The also records note that she was reluctant to start medication. R. at 676

On May 8, 2012, licensed clinical social worker Marianne Donahue sent a letter to the state agency reporting that she had been providing counseling and behavioral health services to Ellis since November 2011. R. at 666. Ellis had reported feeling extremely tired, in pain, and isolated following her surgery. Id. Donahue noted that prior to the surgery, Ellis had attended college, had a good job, and was able to function well with her daily responsibilities but that since the surgery, she spent most of her time in bed/crying and experienced intermittent suicidal ideation. Id. She noted that Ellis had reported witnessing the death of her mother from a sudden heart attack when she was ten years old. Id. Donahue concluded that Ellis was unable to work because of her physical and mental impairments and that although she had worked hard and successfully in her past, to do so now would be detrimental. Id.

On May 9, 2012, Dr. Magile-Quinn, D.O., filled out a physical capacity evaluation form. R. at 668-70. Dr. Magile-Quinn opined that in an eight-hour work-day, Ellis could stand less than three hours, walk less than 1 hour, and sit less than four hours. Id. Dr. Magile-Quinn opined that Ellis could occasionally lift/carry a maximum of 10 pounds and frequently lift/carry a maximum of 0 pounds. Id. Dr. Magile-Quinn opined that Ellis could occasionally bend, kneel, squat, and crawl, but never climb stairs or ladders. Id. Dr. Magile-Quinn opined that because of the pain, Ellis had marked limitation in her ability to perform activity within a schedule, to maintain regular attendance, to be punctual with customary tolerance, to complete a normal work day and work week without interruptions from medically based symptoms, and to perform at a consistent pace without unreasonable number and length of rest periods. Id. Dr. Magile-Quinn noted that Ellis had chronic, unremitting chest wall pain diagnosed as costochondritis following surgery for heart

aneurism repair. Id.  Dr. Magile-Quinn added that Ellis had experienced PTSD type symptoms since surgery including nightmares, insomnia, anxiety, isolation, and depression. Id.  Dr. Magile-Quinn opined that Ellis is "severely deconditioned at this time and in the 2nd trimester of her 1st pregnancy." Id.

Ellis began treating at East Jefferson General Hospital on June 5, 2012, when an echocardiogram was performed. R. at 756. It was normal with ejection fraction of 65%. R. at 756-57. She consulted with Dr. Lois Mailander for postoperative evaluation on September 28, 2012. R. at 722. She reported slight incisional pain. R. at 722. She had no peripheral edema. Id. Another echocardiogram on October 29, 2012, was normal with estimated ejection fraction of 65%. R. at 715. A record dated December 27, 2012, reflects interpretation of a Holter monitor. R. at 708. Ellis was in sinus rhythm with sinus tachycardia. Id.  There were two isolated PVCs and one PAC. Id. No symptoms were noted, but Ellis had pushed the event button multiple times at which some sinus tachycardia was seen. Id.

The next medical record is dated nine months later on September 20, 2013, when Ellis presented at Mother Frances Hospital in Tyler, Texas complaining that she woke up with left upper quadrant pain. R. at 792. She was negative for chest pain and leg swelling. R. at 793. Upon physical examination she had normal heart sounds. Id.  No diagnosis was found. Id. On the same day, she presented at Tyler Urgent Care complaining of pain in her mid-sternum. R. at 840.

The next medical record is dated about ten months later on July 10, 2014, when Ellis was seen by Dr. Stephen Sigal at Sigal Heart Center in Tyler, Texas. R. at 677. It was noted that since her surgery, she had intermittent symptoms of left sided chest pain, which were thought to be due to chest wall discomfort. R. at 677. She reported that about two weeks earlier she had some recurrent central chest pain that she believed to be due to lifting something. Id.  It lasted 3 to 4

days, then resolved spontaneously. Id.  She complained of chest pain and peripheral edema. R. at 678. Upon physical examination, Dr. Sigal noted marked tenderness of the sternum to light palpation. R. at 679. An echocardiogram was performed. R. at 680-81.

Ellis was seen by Dr. Sigal again on August 1, 2014. R. at 674. She reported the Lidoderm patch had improved her chest pain. Id.  Reference was made to a recent echocardiogram showing ejection fraction of 60-65% and no significant valvular abnormalities. Id. Upon physical examination it was noted she had decreased tenderness of the sternum on light palpation. R. at 676. Dr. Sigal recommended she increase her exercise program as tolerated. Id.

She presented at Tyler Urgent Care on January 25, 2015, complaining of chest pain. R. at 829. Ibuprofen was prescribed. R. at 830.

Ellis presented at Mother Frances Hospital in Tyler, Texas, on August 18, 2015, for a CT scan of the head/brain. R. at 775-76. She returned on November 6, 2015, for a CT Calcium Score – Lung Interpretation. R. at 781. Her total calcium score was 0, which means no identifiable plaque and a very low risk of coronary artery disease. R. at 784-85. A Stress (Exercise) Echocardiogram was also performed. R. at 790.

Ellis presented at Christus Trinity Mother Frances Health System, Trinity Clinic – Pulmonary in Tyler, Texas, on December 4, 2015, for evaluation of a 3 mm nodule in her left upper lung. R. at 895. It was noted she had no pulmonary complaints and is a lifelong smoker. Id.  A CT Scan of the chest was performed. Id.  Dr. Julie Philley recommended an unenhanced CT scan of the chest in one year for further evaluation. Id.  In a review of systems, Ellis was negative for sleep disturbance and agitation and she was not nervous or anxious. R. at 897. She was negative for chest pain and leg swelling. Id.  On physical examination, her cardiovascular system had a normal rate, regular rhythm, and normal heart sounds. Id

Ellis presented at Christus Trinity Mother Frances Health System, Trinity Clinic – Cardiology on January 6, 2016. R. at 899.  An EKG was performed. R. at 905-06. Ellis reported that she continued to have some chest pain with daily activity located in the lower sternum since her surgery. Id.  Dr. Marina Flaskas noted that since her last visit, Ellis had undergone a stress echocardiogram that showed good functional capacity. Id. She noted no EKG changes. Id.  Upon a review of systems, Ellis was negative for claudication, cyanosis, dyspnea on exertion, irregular heartbeat, palpitations, and syncope. R. at 909. She was negative for depression and memory loss. Id.

On April 13, 2016, Ellis established care at Christus Trinity Mother Frances Health System Christus Trinity Clinic Broadway Commons and was seen by Shannon J. Schwab, D.O. R. at 946. She presented with chest pain and dysphoric mood. Id.  She was nervous and anxious. Id. She was very tearful, but her thought processes were appropriate with no tangential thinking or pressured speech. R. at 947. She reported suffering chest pain for months and that her cardiologist told her she would have chest pain on and off for the rest of her life. R. at 946. She noted that her mother had died from a heart attack. Id.  She reported worrying about suffering an early death and reported being very anxious with the chronic chest pain. Id.  A history of depression and post manic[2] stress disorder was noted. Id.  Ellis reported thinking about suicide passively, but said she would never commit suicide because she has a daughter and things she wants to live for. Id. Depression screenings were conducted and she scored 6 on the PHQ2 and 25 on the PHQ9. Id.  She was diagnosed with essential hypertension, depression, lung nodule, and chronic chest wall pain. Id. Dr. Schwab noted the status of depression to be both "well controlled and poorly controlled." Id.

---

[2] This may have been intended to read "traumatic."

Medication adherence was emphasized. Id. Buspar 5mg was added to her existing medications of fluoxetine and clonidine. Id. Follow-up counseling was also recommended. Id.

On June 21, 2016, Ellis began seeing Raymond P. Martinez, Licensed Professional Counselor, at Crosspoint Counseling Service. R. at 960. Her insight was poor, her judgment was fair, her affect was flat, her mood was depressed. Id. Her concentration and attention were good and her memory was intact. Id. She reported poor sleep over the previous few days. R. at 963. Martinez noted she was struggling with depression characterized by dysphoria, sadness, poor energy and sleep, and anxiety leading her to feel hopeless. R. at 960.

Ellis first presented for psychiatric treatment with Dr. Joseph Wassef on July 18, 2016. R. at 880.  She reported that her doctor had told her to come and that she takes medication for PTSD and depression. Id. Dr. Wassef performed a psychiatric assessment. Id. Ellis's mood was angry and her affect was depressed. R. at 881. Dr. Wassef assigned a primary diagnosis of PTSD and a secondary diagnosis of depression – severe with psychosis, unresolved grief, heart disease, and chest pain. Id. He ordered therapy. Id.

Ellis saw Dr. Wassef again on August 15, 2016. R. at 878. Her mood was depressed and her affect was dysphoric. Id. She was oriented and her attention, memory, fund of knowledge, and judgment were intact. Id. Her labs were reviewed and all were within normal limits. Id. Her prognosis was the same. Id.

Ellis met with Martinez for a counseling session on August 24, 2016. R. at 965. She was oriented and alert and her functional status was intact. Id. She had a depressed mood and flat affect. Id. Martinez noted that Ellis's affect had been generally flat, but that there were glimmers of affect characterized by longer eye-contact and a brief smile at the beginning of the session. Id. Ellis

reported that she decided to "go ahead and let her doctor prescribe her medication for depression." Id. She had started three days earlier. Id.

She returned to see Martinez on September 7, 2016. R. at 967. Her mood was dysphoric and her affect was flat. Id. She was oriented, alert, and her functional status was intact. Id. Ellis reported having had a tough night with thoughts of death. Id.

She returned to Dr. Wassef on September 14, 2016. R. at 876. She reported she was "ok" and that she still gets angry but not as much. Id. Her mood was depressed. Id. She was oriented, and her attention, memory, and judgment were intact. Id. Her insight into problems and solving them was poor. Id. Her prognosis was the same. Id.

On September 16, 2016, Mr. Martinez filled out a check box form supplied by Ms. Ellis's attorney. R. at 856-859. He indicated Ellis had a marked impairment of ability to accept instruction from or respond appropriately to criticism from supervisors; ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; and ability to respond appropriately to co-workers or peers. Id. He estimated she had extreme impairment of ability to relate to the general public and maintain socially appropriate behavior. Id. He responded that his answer would change if only minimal contact or interaction with others is required. Id. He explained that Ellis had participated well in therapy and in spite of strong symptoms of depression, she had come to all of her appointments and had been compliant in treatment. Id.

Martinez also estimated that Ellis had extreme impairment of ability to perform and complete work tasks in a normal work-day or week at a consistent pace; ability to work in cooperation with or in proximity to others without being distracted by them; and ability to perform at production levels expected by most employers. Id. He estimated that she had mild impairment in ability to process subjective information accurately and use appropriate judgment and ability to

carry through instructions and complete tasks independently. Id.  He estimated she had moderate impairment of ability to maintain attention and concentration for more than brief periods of time. Id.  Martinez estimated that Ellis had marked impairment in ability to respond appropriately to changes in the work setting and ability to tolerate customary work pressures. Id.  He estimated that she had moderate impairment of ability to remember locations and workday procedures and instructions; ability to be aware of normal hazards and take necessary precautions; and ability to behave predictably, reliably, and in an emotionally stable manner. Id.  He estimated she had mild impairment of ability to maintain personal appearance and hygiene. Id. He responded that she would likely deteriorate if placed under stress, particularly the stress of a job. Id.  He explained that she has the potential and ability to work and that she was making progress in her treatment. Id. He added that she is motivated to get better and manage and overcome her symptoms, but stated that she needs more time to get into the position to work under heavy stress. Id.  He responded that Ellis is capable of managing her own funds and that her impairment is expected to last 12 months or more. Id.

Ellis returned to see Dr. Flaskas on September 16, 2016. R. at 914. It was noted that her status post surgery appeared to be ventricular diverticulum. R. at 922.  Ellis reported persistent chest pain. Id. She reported that she had been referred to pain management by her primary care physician but that she did not follow up. Id. Upon a review of systems, she was positive for chest pain, but negative for claudication, cyanosis, and irregular heartbeat. R. at 924.

Ellis returned to Martinez on September 21, 2016. R. at 969. Her mood was brighter and her affect was appropriate. Id.  She was more alert, focused, and more verbal than usual. Id.  She reported being angry, frustrated, and scared about the future because her doctors cannot explain

why she got sick, what she can expect in the future, and if her daughter would suffer the same problems. Id.

Ellis cancelled her October 5, 2016, appointment with Martinez. R. at 971.

At her October 19, 2016, appointment with Dr. Wassef, Ellis reported feeling better and that she still had "moments," but not as bad. R. at 874. Her affect was dysphoric. Id. She was oriented, and her attention, memory, fund of knowledge, and judgment were intact. Id. Her compliance was moderate and her prognosis was improved. Id.

Ellis returned to Martinez on November 2, 2016. R. at 971-72. Her mood was neutral, her affect was appropriate, and she was interactive. Id. Martinez noted that Ellis was brighter and more at ease than at her previous session. R. at 972. She reported having spent the preceding two weeks in Louisiana around family and people that had hurt her in the past. Id.

Ellis had a session with Martinez on November 16, 2016. R. at 974. Her mood was depressed, but her affect was appropriate and she was interactive. Id.

At her November 28, 2016 appointment with Dr. Wassef, she reported doing "ok." R. at 872. Her affect was depressed. Id. She was oriented, and her attention, memory, fund of knowledge, and judgment were intact. Id. Her compliance was noted to be fair, and her prognosis had declined. Id.

At Ellis's December 5, 2016, session with Martinez, she had a neutral mood and flat affect. R. at 976. Martinez noted that Ellis left the session feeling upbeat and hopeful. Id. When exploring her current depression level, she explained that it stems mainly from having to deal with physical problems stemming from the open heart surgery. Id. She described that her visit to Louisiana for Thanksgiving had been hard but she was able to endure it. Id.

Ellis returned to Dr. Wassef on February 1, 2017. R. at 870. She reported that the holidays were "ok" but she was sad. Id. Her affect was dysphoric. Id. She was oriented, and her attention, memory, fund of knowledge, and judgment were intact. Id. Her compliance was noted to be poor and her prognosis was the same. Id. Dr. Wassef's special orders were that she needed more activities and socialization. Id.

At her March 29, 2017 appointment with Dr. Wassef, Ellis reported doing "ok." R. at 868. She was oriented and her attention and memory were intact. Id. Her mood was unhappy and her affect was dysphoric. Id. Her compliance was noted to be poor and her prognosis was the same. Id. Special orders included that she needs to go, do, and be with others. Id.

Ellis returned to Christus Trinity Clinic to see Dr. Schwab on April 5, 2017, complaining of ear pain and right arm pain. R. at 954. She reported chronic chest pain and wondered if it was related to the pain in her arm for the last several months. R. at 954. It was noted that she was following with Dr. Wassef from psychiatry for PTSD. Id. Upon physical examination, her cardiovascular system had normal rate, regular rhythm, normal heart sounds, and intact distal pulses. R. at 956. Examination of the upper extremity showed good muscle strength of 5/5, that she could do an arc to 180 degrees, and that she was able to flex extend and internally rotate. Id. She had some tenderness along her right bicep muscle, but no tenderness in the bicep tendon area. Id. She was placed on a Medrol Dosepak for her arm pain. Id. It was noted that she was taking gabapentin for the chronic chest pain. Id. She requested referral to pain management. Id. It was noted that her chest pain "has been thought to be secondary from scar tissue from the previous surgery." Id.

The next record of a session with Martinez is dated April 12, 2017. R. at 978. Ellis's mood was dysphoric, but her affect was appropriate. Id. She reported recently losing her mother-in-law, her last mother figure after the loss of her grandmother. R. at 978

At her May 1, 2017, appointment with Dr. Wassef, she reported doing fine. R. at 866. She was oriented, and her attention, memory, and judgment were intact. Id. Her affect was flat and her mood was "ok." Id. Her insight into problems and solving them was poor. Id. Dr. Wassef noted that her compliance was poor and added that if she were not following directions, he would not continue to see her. Id. Her prognosis was the same. Id.

Ellis met with Martinez on May 3, 2017. R. at 981. Her mood was dysphoric and her affect was appropriate. Id. She reported feeling discouraged after talking to her psychiatrist and feeling like he was rude and was not listening to her. Id.

At her May 17, 2017, session with Martinez, Ellis had a depressed mood and appropriate affect. R. at 1360. Martinez noted that her mood appeared to be becoming brighter and her affect more spontaneous. Id. She appeared more upbeat, but still dysphoric. Id. He noted definite improvement. Id.

At her May 31, 2017, session with Martinez, Ellis had depressed mood and appropriate affect. R. at 985. She described "vague/mild chest pain." Id. She was skeptical of her doctor because she had reported the pain, but he said he could not find anything wrong on the test she ran. Id.

Ellis followed up with Dr. Wassef on June 7, 2017. R. at 864. She reported doing better. Id. She was seeing her therapist, getting some ideas, and working on grief. Id. She reported being able to face problems better. Id. Her mood was euthymic. Id. She was oriented, and her attention, memory, and judgment were intact. Id. Her prognosis was improved. Id.

On June 14, 2017, Ellis met with Martinez. R. at 987. She had a neutral mood and appropriate affect. Id. Martinez noted her mood appeared brighter and her affect was spontaneous. Id. She expressed frustration at the recommendation of her psychiatrist, Dr. Wassef, that she be around people more. Id. She explained that even before she had depression, she did not do that. Id. Her therapist explained that because she is an introvert, being around people might look different for her than for an extrovert. Id. She mentioned having chest pain that comes sporadically but does not last long. Id.

At her July 17, 2017, appointment with Dr. Wassef, her mood was "ok" and her affect was euthymic. R. at 1041. Her prognosis was improved. Id. Her memory and judgment were intact, her insight into problems and solving them was fair. Id. She was started on Olanzapine. Id.

At her July 17, 2017, session with Martinez, Ellis presented with a neutral mood and appropriate affect. R. at 990.

At her September 15, 2017 appointment with Dr. Wassef, Ellis's mood was "ok" and her affect was euthymic. R. at 1039. Her memory and judgment were intact, her insight into problems and solving them was fair. Id. Dr. Wassef noted that she went out a bit more in the last month and that her husband felt she was getting better. Id. Dr. Wassef noted her prognosis was improved. Id. Olanzapine was discontinued. Id.

Ellis had a session with Martinez on September 29, 2017. Her mood was depressed and her affect was appropriate. Id. Martinez noted that Ellis seemed sad. Id.

At her October 4, 2017, session with Martinez, Ellis had a depressed mood and appropriate affect. R. at 1046. She reported taking a new antidepressant. Id.

She returned to the Christus Trinity Clinic to see Dr. Schwab on October 5, 2017, requesting blood work. R. at 1008. She also reported concerns of constipation and sought a diuretic. R. at 1008-09. She reported problems with chronic chest pain and that she still has discomfort that affects her sleep. R. at 1009. It was noted that she had no problems with lower extremity edema. Id. Upon physical examination, her cardiovascular system had normal rate, regular rhythm, and normal heart sounds. R. at 1011. She had normal mood and affect. Id. To address her chest pain, she was to increase Neurontin to 300mg at bedtime. R. at 1012.

At her October 16, 2017, session with Martinez, Ellis had a euthymic mood and appropriate affect. Id. She was interactive. Id. She reported that her pain medication had been increased. Id. She reported that her biggest concern was her health and that she gets frustrated with the pain. Id. She reported that the pain came often and was so intense at times that it interfered with her ability to do simple things like embrace her daughter. Id.

At her October 19, 2017, appointment with Dr. Wassef, Ellis still complained of feeling chest pain. R. at 1037. Her mood was "ok" and her affect was dysphoric. Id. Her memory and judgment were intact, her insight into problems and solving them was fair. Id. Dr. Wassef noted that more activities were needed, but that her prognosis was improved. Id.

On December 18, 2017, Ms. Ellis followed up with Dr. Wassef. R. at 1035. Her mood was better and her affect was euthymic. Id. Her memory and judgment were intact, her insight into problems and solving them was fair. Id. Dr. Wassef noted her prognosis was improved. Id.

Ellis returned to Martinez on January 25, 2018, with a euthymic mood, appropriate affect, and was interactive. R. at 1050. She was bright and her affect was spontaneous. Id. She reported trying to make changes to keep from relapsing with depression. Id. She also reported she was

considering getting a job, but she was fearful of her physical limitations and triggering a relapse. Id.

At her February 5, 2018, session with Martinez, Ellis had a euthymic mood. R. at 1355. Martinez noted her mood appeared brighter and that her affect was spontaneous. Id. He noted this was similar to her last session and that this marked a streak of improvement where she is becoming more hopeful and optimistic. Id.

At her February 28, 2018, session with Martinez, Ellis had a dysphoric mood. R. at 1052. Martinez noted a significant change in Ellis's mood since her last session. Id. He noted she was despondent. Id. She had experienced an increase in anxiety, dysphoria, feelings of hopelessness, and poor sleep characterized by nightmares. Id. She reported feeling thoughts of suicide. Id. She reported feeling pressured by Social Security to hurry and get well. Id. Martinez opined that Ellis could benefit from a continuance of counseling and government assistance. Id. He stated that she had improved in stability and that her condition was still fragile and she was still vulnerable to relapse. Id.

Ellis presented at Trinity Clinic – Cardiology, on March 12, 2018, complaining of chest pain and feeling "I am going to die." R. at 1216. She was seen by FNP Toby Silvertooth. Id. She reported the chest pain onset about a week earlier which had increased in nature since that time. Id. She did not have pleuritic chest pain, shortness of breath, or lower extremity edema in the previous week. Id. She had not been immobile for an extended period of time in the last three weeks. Id. Upon physical examination her heart had regular rhythm, normal heart sounds, intact distal pulses, and normal pulses but tachycardia was present. R. at 1218. She exhibited no chest tenderness. Id. A coronary CT angiogram was ordered and she was started on a Medrol Dose pack. R. at 1221.

Ellis returned to Dr. Wassef on March 18, 2018. R. at 1481. Her affect was dysphoric. Id. She was frustrated with her medical issues. Id. Her memory and judgment were intact, and her insight into problems and how to solve them was fair. Id. Her prognosis had declined. Id.

She followed up on March 26, 2018, and was seen by Dr. Flaskas. R. at 1252. The echocardiogram showed no evidence of pericardial effusion, normal left ventricular systolic function. Id. She reported pain may be better, but that she continued to experience it and was limited in her activities. R. at 1253 She was continued on colchicine. Id. Upon physical examination, she exhibited no chest tenderness. R. at. 1255.

Ellis returned to the Christus Trinity Clinic to see Dr. Schwab on March 28, 2018, for a follow up from cardiology. R. at 1058. She reported being seen recently by her cardiologist and placed on indomethacin and colchicine for possible endocarditis. Id. She had been getting symptom relief but not resolution. Id. She reported having difficulty swallowing over the previous month. Id. She reported no respiratory symptoms or shortness of breath. Id. Upon physical examination, she had normal rate, rhythm, and heart sounds and intact distal pulses. R. at. 1060. She exhibited no chest tenderness. Id. For chest pain, she was started on Neurontin 300mg at bedtime if the pain persisted. R. at. 1061.

Ellis returned to Martinez on May 17, 2018, with a euthymic mood and appropriate affect. Id. She was engaged and participated well. Id. She explained that she had not been to see Martinez in recent months because she had experienced a different type of chest pain and had frequent doctor's appointments. Id.

At her May 18, 2018, appointment with Dr. Wassef, Ellis reported doing about the same. R. at 1479. Her mood was "ok" and her affect was dysphoric. Id. Her memory and judgment were

intact, and her insight into problems and how to solve them was fair. Id.  Her prognosis was the same. Id.

Ellis presented at the Christus Mother Frances Hospital Emergency Department on May 27, 2018, complaining of chest pain. R. at 1416. She reported that pain the previous day was not too bad and had improved with Motrin, but in the morning the pain was worse and was not helped by 3 aspirin. R. at. 1416-17. She described the pain as sharp and stabbing, the severity was moderate. R. at 1417. Id.

At her May 31, 2018, session with Martinez, Ellis had a euthymic mood and appropriate affect. R. at 1362. She was engaged and participated well. Id.  She was discouraged about continuing chest pain that resulted in a hospital admittance the previous weekend. Id.

At her July 25, 2018 appointment with Dr. Wassef, Ellis reported she thought she was doing good. R. at 1477. Her mood was "ok" and her affect was dysphoric. Id.  Her memory and judgment were intact, and her insight into problems and how to solve them was fair. Id.  Her prognosis was the same. Id.

Ellis followed up with Dr. Flaskas in Cardiology, on August 6, 2018. R. at 1273. Chest pain, atypical in presentation was noted. R. at 1273. Ellis complained of chest pain on and off through the years. R. at 1274. She followed up with Dr. Flaskas on December 14, 2018. R. at 1300. She described the chest pain as recurrent, on the left side, and relieved in minutes or so.  Id. A cardiac MRI was scheduled. R. at 1305.

Ellis returned to Martinez on September 24, 2018, with a euthymic mood and appropriate affect. R. at 1364. She had lost 18 pounds and appeared to be feeling better. Id.  She was more alert and upbeat. Id.  She mentioned that she might be putting on a front. Id.  She reported still

struggling and that she had recently lost her favorite uncle to cancer, but she seemed better in spite of everything else. Id.

At her October 2, 2018, appointment with Dr. Wassef, Ellis reported doing ok but still struggling with chest pain. R. at 1475. Her affect was dysphoric, but her mood was noted to be "more snappy lately, her normal." Id. Her memory and judgment were intact, and her insight into problems and how to solve them was fair. Id. Her prognosis was the same. Id.

At her October 8, 2018, session with Martinez, Ellis had a depressed mood. R. at 1366. Nonetheless, Martinez noted she was engaged and participated well. Id. Her affect seemed a bit more spontaneous and her mood was brighter. Id. She was discouraged about her visit to her psychiatrist. Id. She feels he does not listen to her and when he does he misunderstands her. Id.

At her October 23, 2018, session with Martinez, Ellis had a euthymic mood and appropriate affect. R. at 1368. But Martinez also noted she appeared flat and dysphoric and that she reported feeling a little depressed. Id. She was able to make eye contact and was engaged. Id.

At her January 22, 2019, appointment with Dr. Wassef, she complained of chest pain and burning in her throat. R. at 1158. Her mood was worse, her affect was dysphoric, and her prognosis was the same. Id.

At her February 20, 2019, session with Martinez, her mood was euthymic and her affect was appropriate. R. at 1371. She was engaged and participated well. Id. But she reported feeling depressed, frustrated, lonely, and isolated. Id. She said she wished she could work but she said she was in so much physical pain that it affects her emotionally. Id. Martinez also noted her mood to be dysphoric and her affect to be flat. Id.

At her March 1, 2019, session with Martinez, Ellis had a depressed mood. R. at 1374. She reported feeling frustrated and helpless. Id.

*Hearing Testimony*

A hearing was held before the ALJ on March 19, 2019. R, at 32. Ellis was represented by her attorney. Id.

Ellis testified that she graduated with a bachelor's degree in General Business from Southeastern Louisiana University in 2007. R. at 39. She worked as an operations manager for a Waffle House store from 2007 through 2011. Id. Before that she worked as an assistant manager for Shoe Show and an assistant store manager for Foot Locker. R. at 40.

The ALJ asked Ellis to explain why she believed she was still disabled. R. at 41. She cited "lots of chest pains" that she experiences daily. Id. She reported that they had not gotten better since 2011. Id. She admitted she had not been hospitalized for the pain, but said she had been prescribed Gabapentin. R. at 41-42. She reported that it helps sometimes, but sometimes it does not. R. at 42. She noted that her dosage was increased in 2018. Id. She described the chest pain as constant and said that it becomes severe when she moves around. R. at 43. She reported using cold compresses daily for about five hours. Id. She reported feeling chest pain at the time of the hearing. Id. She said this was mainly because of her bra. Id.

Ellis also reported that she experiences swelling in her feet. Id. She said that they swell a lot and she tries to keep them elevated. R. at 51. And she reported mental health issues of anxiety, depression, and PTSD. R. at 43-44.

Ellis lives with her brother, husband, aunt, and her six-year-old daughter. R. at 44. She reported that her aunt moved in to help around the house about two years earlier. R. at 49. She reported that the other adults in the household keep up with the cleaning and take care of her daughter. Id.

Ellis testified that during the day she mostly lays down alone in her room. R. at 45. She makes breakfast a couple of times a week. Id. She does not read or watch TV. R. at 47. She leaves the house to go church about once a month, to go to her doctor's appointments, and sometimes to go to the store to pick up a few things. R. at 47. Sometimes she drives, but she did not drive herself to the hearing. R. at 46.

Ellis described a bad day as a day where she gets angry fast and she prefers to be left alone. R. at 48. On a good day, she might watch her daughter get ready for school, make her oatmeal, or let her daughter come in the bed and play. Id. She reported that most of the time she is in pain, her chest is hurting, and she does not want to be bothered. Id. She testified that the pain makes it difficult to focus on anything. R. at 50.

Vocational Expert Kasey Crawford-Suggs testified at the hearing. R. at 52. The ALJ asked her to consider a hypothetical individual of the same age, education, and work history as Ellis who could perform the full range of medium exertional activity, except that she can understand, remember, and carry out detailed instructions but nothing complex and she can interact with others on superficial work related matters but nothing deep or penetrating. R. at 53. She testified that such an individual could not perform Ellis's past work. R. at 54. However, she testified that such a person could perform work as maid and housekeeping cleaner, DOT 323.6987-014, light, SVP 2, unskilled, with 446,852 jobs available in the national economy; janitor and cleaner, DOT 381.687-018, medium, SVP 2, unskilled, with 1,366,129 jobs available in the national economy; and dishwasher, DOT 318.687-010, medium, SVP 2, unskilled, with 304,991 jobs available in the national economy. Id.

The ALJ asked the vocational expert to consider whether such a person could perform any work if she was expected to be off-task, on average, 15% of expected work time. Id. The expert testified that such a person would not be able to maintain competitive employment. Id.

Ellis's attorney asked the vocational expert whether the individual could perform any work if she would have frequent difficultly interacting with supervisors and coworkers, would not be able to frequently perform at production level expected by most employers, could not respond appropriately to change in the work setting, and could not tolerate customary work pressure. R. at 55. The vocational expert testified that such a person could not maintain work activity. Id.

### Decision of the Administrative Law Judge

The ALJ found that the medical evidence established that since March 22, 2016, Ellis had the following medically determinable impairments: obesity, costochondritis, status-post splenic infarct, major depressive disorder, and post-traumatic stress disorder. R. at 12. The ALJ determined that since March 22, 2016, Ellis has not had an impairment or combination of impairments that meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. The ALJ further determined that the medical evidence supports a finding that by March 22, 2016, there had been a decrease in medical severity of the impairments presents at the time of the comparison point decision ("CPD") issued on June 26, 2012. R. at 13. The ALJ found the impairments had decreased to the point where Ellis:

> has had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that, while she can understand, remember, and carry out detailed instructions, she cannot perform complex work activity. Further, the claimant is limited to only superficial, work-related interactions with others.

R. at 14. The ALJ found Ellis's medical improvement is related to ability to work because it increased her residual functional capacity. Id.

The ALJ determined that Ellis continued to have a severe impairment or combination of impairments. Id.  The ALJ found that since March 22, 2016, Ellis has had the residual functional capacity described above. Id.  The ALJ considered the testimony of a vocational expert and determined that Ellis has been able to perform a significant number of jobs in the national economy since March 22, 2016, and that her disability ended on that date. R. at 20-21.

## Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ's finding of medical improvement is contrary to 20 C.F.R. § 404.1594(b)(1)(i) because it is not based on improvement in symptoms, signs, and/or laboratory findings.

Issue No. 2.    Whether the ALJ failed to accord the appropriate weight to the findings of claimant's treating counselor.

## Analysis

### I. Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  This court may not re-weigh the evidence, try the issues de novo, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v.

Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Termination of Benefits under the Act.

Once an individual has been found disabled under the Act, the individual's disability benefits can be terminated if substantial evidence demonstrates that "(A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity." Griego v. Sullivan, 940 F.2d 942, 943–44 (5th Cir. 1991) (quoting 42 U.S.C. § 423(f)). According to the applicable regulations, "[m]edical improvement is any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594 (b)(1). A finding that medical severity has decreased "must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." Id.  A decrease in medical severity is "related to the individual's ability to work" when there has also been an increase in the claimant's "functional capacity to do basic work activities." Id. § 404.1594 (b)(3).

The second part of the evaluation is whether the claimant is able to engage in substantial gainful activity, which is similar to the standard governing initial determinations except "that the ultimate burden of proof lies with the Secretary in termination proceedings." Griego, 940 F.2d at 944 (5th Cir. 1991). "The basis for [the] presumption [of continuing disability] is that a prior

determination of disability is binding on all parties to the hearing and has a res judicata effect as to that record." Gill v. Heckler, 740 F.2d 396, 397 (5th Cir. 1984). Substantial gainful activity is "work activity involving significant physical or mental abilities for pay or profit." Joseph v. Astrue, 231 F. App'x 327, 330 (5th Cir. 2007) (quoting Newton v. Apfel, 209 F.3d 448, 452 (5th Cir.2000)). "The ability to engage in substantial gainful activity is determined through an 'objective assessment of [the] functional capacity to do basic work activities' and a consideration of vocational factors." Id. (quoting 20 C.F.R. § 404.1594(b)(5)).

### III.    Plaintiff's Appeal.

*Issue No. 1.    Whether the ALJ's finding of medical improvement is contrary to 20 C.F.R. § 404.1594(b)(1)(i) because it is not based on improvement in symptoms, signs, and/or laboratory findings.*

#### a.  Parties' Arguments

Plaintiff argues that the ALJ's finding of medical improvement is erroneous because it is not supported by symptoms, signs, and laboratory findings. She argues that at the time of the original decision, her medical records showed she could walk two miles daily and that she experienced some chest wall discomfort and occasional palpitations. Testing at that time failed to show structural wound problems or decompensated heart failure. Plaintiff insists that current testing records are the same. She says they show that she remains fairly sedentary and continues to experience chest pain.

Plaintiff further argues that her mental health condition has not improved. She points out that the only medical opinion in the file is that of LPC Martinez, who indicated that Ellis has marked impairment in social interactions, including responding appropriately to co-workers and peers and extreme limitation in relating to the general public and maintaining socially appropriate behavior. LPC Martinez reported that Ellis continued to experience symptoms of depression

28

despite participating in therapy. He concluded that she had marked limitation in the ability to tolerate customary work pressure and stated that she would likely deteriorate if placed under stress, particularly that of a job. He felt that Ellis could work eventually, but that she was not ready to do so. He also found moderate limitation in maintaining attention and concentration for more than a brief period of time and in behaving predictably, reliably, and in an emotionally stable manner. In February 2018, he found that she had regressed and needed ongoing mental health services and government assistance. Ellis insists that her more recent condition is the same or worse than at the time of the comparison point decision.

Plaintiff argues that the ALJ must make a finding of medical improvement based on symptoms, signs, and laboratory findings at Step 2 before the ALJ can consider an increase in functional abilities at Step 3. She argues that because the ALJ's medical improvement finding here cannot stand, neither can the ALJ's finding that medical improvement is related to ability to work.

The Commissioner responds that substantial evidence supports the ALJ's determination of medical improvement and that the determination is based on the symptoms, signs, and laboratory findings associated with Ellis's impairments. The Commissioner points to Ellis's normal echocardiograms in October 2012, July 2014, and November 2015, as well as the notes of Dr. Flaskas in January 2016 that Ellis reported no cardiovascular symptoms and her physical examination was normal. The Commissioner notes Ellis's April 2016 visit with Dr. Schwab where a physical examination revealed no abnormalities and Dr. Schwab diagnosed depression and chronic chest wall pain. Dr. Schwab prescribed gabapentin and referred Ellis to pain management. In September 2016, Ellis told Dr. Flaskas that she had not followed up with the pain management referral from Dr. Schwab. Ellis requested another pain management referral in April 2017, but in June 2017 she remarked that her chest pain "comes sporadically but doesn't last long." The

Commissioner points out that Ellis presented to Dr. Schwab in October 2017 to request bloodwork and a diuretic to remove water weight and only incidentally complained of ongoing chest pain that affected her sleep. Gabapentin at bedtime was prescribed. The Commissioner notes that when Ellis returned to the cardiology clinic in March 2018 complaining of chest pain, she stated it had started one week prior and increased since then. She denied all other cardiovascular and respiratory symptoms. Aside from a slightly increased heart rate, her physical examination was normal. The nurse practitioner noted her chest pain was more likely due to costochondritis than coronary artery disease.

The Commissioner points out that at Ellis's follow up with Dr. Flaskas in March 2018, her echocardiogram revealed normal left ventricular function and no evidence of pericardial effusion. At that visit, Ellis told Dr. Flaskas that her chest pain had improved with medication, but that she had been limiting her activities because she feared something was wrong with her hear. The Commissioner cites Ellis's May 2018 visit to the emergency room complaining of chest and neck pain at which time she stated that the previous morning the pain had been "not too bad." A muscle relaxant and pain medication alleviated her symptoms. She was diagnosed with pleuritic chest pain, chest wall pain, and neck strain and was discharged with instructions to follow up with her primary care physician and cardiologist.

But she did not return to Dr. Flaskas until August 2018. It was noted that Ellis had complained of chest pain "off and on throughout the years." Dr. Flaskas indicated that an electrocardiogram had shown some change but nothing significant compared to previous studies. The Commissioner also points to the most recent treatment records from December 2018 when Dr. Flaskas indicated that Ellis presented with chest pain, but it was relieved in minutes and therefore appeared to be musculoskeletal.

The Commissioner argues that the ALJ's conclusions regarding Ellis's physical condition are, therefore, supported by the medical record. The ALJ found that although Ellis presented to her cardiologist and primary care physician with complaints of chest pain over the years, she did so sporadically and failed to follow the treatment plans and recommendations provided to her. The ALJ also found that Ellis frequently reported that the chest pain occurred intermittently and lasted only a short time and that the treating providers consistently noted that the etiology was likely not cardiac in nature.

The Commissioner argues that the evidence also supports the ALJ's finding of medical improvement as to Ellis's mental impairments. The Commissioner cites records of Ellis's treatment with psychiatrist Dr. Wassef beginning in July 2016. The Commissioner notes that by June 2017, Dr. Wassef's notes indicate that Ellis was doing better and seeing a counselor. The Commissioner submits that her mental status examinations were mostly normal and that throughout July, September, and October 2017, her mental symptoms continued to abate and Dr. Wassef characterized her prognosis as improved. The Commissioner points out that in December 2017, Ellis advised Dr. Wassef that she was doing fine and going to church. The Commissioner cites the most recent treatment evidence from Dr. Wassef dated October 2018 when Ellis reported doing okay, though she continued to struggle with chest pain and was "not doing very much." The Commissioner adds that the ALJ discussed Ellis's counseling records at length. He points out that in the most recent counseling session records dated February and March 2019, Ellis complained of feeling misunderstood and not receiving appropriate medical care as a result, but she was engaged, oriented and alert, actively participated in the counseling sessions, and her functional status was intact.

The Commissioner submits that, as the ALJ found, the record shows that Ellis saw improvement when treating regularly for mental impairments, but she occasionally cancelled appointments, lapsed in treatment, and that following those lapses she suffered an exacerbation of her symptoms. The Commissioner adds that the ALJ correctly found that the records show Ellis often related her mental symptoms to issues related to the deaths of family members and her alleged physical impairments.

With regard to the ALJ's evaluation of the September 2016 report/evaluation of LPC Martinez, the Commissioner argues that the ALJ provided an adequate basis for discounting the findings. The Commissioner points out that the ALJ discussed the Martinez report at length. The ALJ recognized that Martinez is not an "acceptable medical source" as defined by the regulations. Next, the ALJ observed that Ellis only began seeing Martinez three months before the report in question. Finally, the ALJ found that Martinez's opinions that Ellis had marked to extreme limitations in social functioning is not supported by the treatment records as whole.

The Commissioner argues that the ALJ did not pick and choose evidence to support his decision, but instead, considered all of the evidence in formulating his decision. The Commissioner insists that substantial evidence supports the ALJ's ultimate decision that Ellis experienced medical improvement and was no longer disabled.

b. *Analysis*

The court finds that the ALJ's finding of medical improvement is supported by substantial evidence. Ellis argues that the finding is not supported by symptoms, signs, and laboratory findings, but the medical records offer that very support.

As to Ellis's physical condition, Ellis was originally found to be disabled as of April 25, 2011, the day of her heart surgery. The June 26, 2012, comparison point decision, found Ellis

limited to lifting 10 pounds occasionally and no weight frequently and that she would unable to sit for more than four hours, walk for one hour, or stand for three hours daily. Ellis would also require unscheduled breaks. In making this finding the ALJ appeared to rely heavily on the May 2012 physical capacity evaluation by Dr. Magile-Quinn, which contained the same restrictions. The medical records since June 2012 clearly reflect improvement from the previous ALJ's assessment of Ellis's physical condition. As the ALJ and Commissioner point out, there are gaps in treatment of her chest pain, with no treatment or complaints of chest pain between December 2012 and September 2013, between September 2013 and July 2014, and between January 2015 and January 2016. Although she reported that she had chest pain that made her feel she was "going to die" in March 2018, she reported that the pain had onset a week earlier. R. at 1216. She reported some improvement and had no chest tenderness by March 26, 2018. R. at 1253. In May 2018 she reported chest pain the previous day had not been too bad but had gotten worse that morning. R. at 1416-17. By August 2018, she described experiencing chest pain on and off through the years and in December 2018 she reported that her chest pain was recurrent and relieved in minutes or so. R. at 1305. The records consistently show normal echocardiogram and electrocardiograms and her treating physicians regularly concluded that the pain was not cardiac in nature. Ellis's argument that her condition did not in fact change from the time of the comparison point decision is based on her selective presentation of evidence from 2011 or 2012 that does not actually support the ALJ's finding of disability and was not even cited by the ALJ in issuing the 2012 decision. [3]

---

[3] For example, Ellis cites notes in her September 2011 medical records that she was walking two miles daily and experienced some chest wall discomfort and occasional palpations. R. at 569. This record was not discussed by the ALJ in the comparison point decision. Ellis also argues that "her testing" at the time of the comparison point decision failed to show structural wound problems or decompensated heart failure. The cited medical record from November 2011 contains this note and also references normal left ventricle ejection fraction per an echocardiogram six months earlier. R. at 562. But these medical findings were not cited or relied on by the ALJ in issuing the comparison point decision. By choosing to focus solely on the most positive medical records from 2011 and 2012, Ellis seems to make the case that the ALJ should never have found her disabled in the first place.

Instead, considering the record as a whole, there is substantial evidence to support the ALJ's finding that Ellis experienced medical improvement in her physical impairments.

With regard to Ellis's mental condition, the court finds that the ALJ's finding of medical improvement is also supported by substantial evidence. Ellis focuses on the 2016 opinion of LPC Martinez and a February 2018 treatment record with Martinez when he found she had regressed. She ignores the voluminous other mental health records. As discussed further below, the ALJ considered and discounted Martinez's 2016 opinion because he is not an "acceptable medical source" under the regulations and because he had only been treating Ellis for a few months at the time of the opinion. At Ellis's next visit with Martinez following the September 2016 opinion, he noted she was more alert, focused, and verbal, her mood was brighter and her affect was appropriate. R. at 969. At her following appointment with Martinez in November 2016, she was interactive and brighter. R. at 972. She left her December 5, 2016, session with Martinez feeling upbeat and hopeful, and had explained that her depression stemmed from dealing with physical problems from her heart surgery. R. at 976. Only 23 days before the February 2018 record cited by Ellis, Martinez noted a streak of improvement with Ellis becoming more hopeful and optimistic. R. at 1355. Indeed, between October 16, 2017, through February 5, 2018 she presented with euthymic mood, appropriate affect, and was interactive during therapy sessions. After her February 28, 2018, appointment with Martinez she did not return until May 17, 2018, and at that session she had a euthymic mood, appropriate affect, and was engaged and participated well. The same was noted at her May 31, 2018 appointment. She did not see Martinez again until September 2018 when she again had euthymic mood and appropriate affect. Martinez noted she was more spontaneous and her mood brighter, even though she was struggling with the recent loss of her favorite uncle to cancer. Similarly, in her visits with her psychiatrist Dr. Wassef, she reported

doing "ok," fine, or better in every visit with Dr. Wassef between September 2016 and December 2017. Although she was dysphoric and frustrated with medical issues in March 2018, from May 2018 through October 2018 she again reported doing "ok." Per Dr. Wassef, her memory and judgment were regularly intact and her insight into problems was fair. Between June 2017 and December 2017, Dr. Wassef consistently noted that her prognosis had improved. The signs and symptoms reflected in the mental health records provide substantial evidence supporting the ALJ's conclusion that Ellis had experienced medical improvement in her mental condition.

*Issue No. 2.   Whether the ALJ failed to accord the appropriate weight to the findings of claimant's treating counselor.*

   a.  *Parties' arguments*

   In the alternative, the plaintiff argues that the ALJ failed to accord appropriate weight to the opinions of Ellis's treating source in assessing her residual functional capacity. She argues that the ALJ improperly failed to consider LPC Martinez's opinions without any legal basis.  She submits that LPC Martinez's opinion is supported by findings of elevated PHQ score, by Dr. Wassef's treatment records reflecting increases or changes in Ellis's medications, and by observations of other treating sources who noted depression and anxiety. She argues that LPC Martinez's notes reveal Ellis's daily struggle with depression and social isolation, poor energy, sleeping problems, and being overwhelmed by mundane things and an inability to function outside a very supportive environment. She insists that these things have not changed since the comparison point decision. She argues that the ALJ has impermissibly played doctor. She notes that although LPC Martinez is not a physician, he examined Ellis on multiple occasions and his findings are thorough and detailed. She argues that his opinion should be accepted and that the ALJ improperly substituted his lay opinion for those of a licensed counselor.

As noted above, the Commissioner argues that the ALJ provided an adequate basis for discounting the findings of Martinez. The court agrees. The ALJ discussed the Martinez report at length. The ALJ recognized that Martinez is not an "acceptable medical source" as defined by the regulations. Only acceptable medical sources can give medical opinions and only acceptable medical sources can be considered "treating sources" whose opinions may be entitled to controlling weight. Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencie, SSR 06-03P (S.S.A. Aug. 9, 2006). "Information from . . . 'other sources' cannot establish the existence of a medically determinable impairment . . . . However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. Although not required by the regulations, Social Security Administration guidance instructs that the factors in 20 CFR § 404.1527(d) and §416.927(d) "can be applied to opinion evidence from 'other sources.'" Id. These factors are:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

Id.

As the Commissioner points out, the ALJ here considered that Ellis only began seeing Martinez in June 2016, three months before his September 2016 opinion. Indeed, Martinez had only seen Ellis three times at the time he filled out the form supplied by her attorney in September 2016. See Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009) (affirming the ALJ's finding that

a physician's opinion was of limited probative value where the physician had "completed a restrictive fill-in-the-blank and check-the-block 'psychiatric/psychological impairment questionnaire,'" the examination occurred after the relevant period, and the physician had only seen the plaintiff five times prior to that assessment, with most of the visits lasting significantly less than 20 minutes, a relationship described by the court of appeals as "relatively fleeting").

The ALJ here also determined that Martinez's September 2016 findings that Ellis had marked to extreme limitations in social functioning are not supported by the treatment records as a whole. The ALJ cited records of her visits with Dr. Wassef from June through December 2017 and May through October 2018. As discussed above, Ellis reported to Dr. Wassef that she was "ok" or "good" at most of these visits, and Dr. Wassef on most occasions noted her prognosis to be improved or the same. Her memory and judgment were regularly intact and her insight into problems and how to solve them was fair. The ALJ also cited Ellis's June 2017 visit with Martinez when he noted she was brighter, spontaneous, made more eye contact and was more verbal than when she first started coming to counseling. R. at 987. The ALJ also cited her January 2018 visit with Martinez when he also noted her to be bright and spontaneous, that she was engaged and participated well, and that she was making changes to better herself and keep from relapsing with depression. R. at 1050. At that visit she even reported that she was considering getting a job. Id. All the treatment evidence cited by the ALJ supports the ALJ's conclusion that Martinez's September 2016 opinion is not supported by the treatment record as a whole.

This is not a case where the ALJ has failed to consider the opinion at all, as Ellis seems to argue. Nor is it a case where the ALJ failed to explain the reasons for discounting an opinion. The ALJ did not make his own assessment of Ellis's condition, but instead, looked to the treatment records with both Martinez and Dr. Wassef, an acceptable medical source, in determining the

weight to provide Martinez's September 2016 opinion. The ALJ considered Martinez's opinion and provided a reasonable basis supported by evidence for discounting it. There is no basis to reverse this finding.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 18) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 25) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 20th day of April, 2021.

Janis van Meerveld
United States Magistrate Judge